### WYLIE PERMANENT CAMPING CO. v. LYNCH.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1912.)

No. 993.

1. CORPORATIONS (§ 507*)—ACTIONS—SERVICE—STATE AUDITOR—"NONRESIDENT DOMESTIC CORPORATION."

Code W. Va. 1906, c. 32, § 124, defines a nonresident domestic corporation as one whose principal place of business or chief works is located without the state, and chapter 124, § 8a, declares that the State Auditor shall be, and is constituted, the attorney in fact for and on behalf of every nonresident domestic corporation which by power of attorney shall appoint such Auditor and his successors in office attorney in fact to accept service of process. *Held*, that the State Auditor by virtue of the statute alone without act on the part of the corporation is authorized to accept service of process for it, and hence where a corporation was

---

chartered in West Virginia. but none of its officers resided there, jurisdiction was properly obtained by service of process on the State Auditor.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1971–2000; Dec. § 507.*

For other definitions, see Words and Phrases, vol. 5, pp. 4823–4825; vol. 8, p. 7733.

Service of process on foreign corporations, see notes to Eldred v. American Palace Car Co., 45 C. C. A. 3; Cella Commission Co. v. Bohlinger, 78 C. C. A. 473.]

**2. COURTS (§ 280*)—JURISDICTION—EVIDENCE.**

A federal court in determining the question of jurisdiction is not limited to the return of the marshal and declaration, but may look to the entire record.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 816–818; Dec. Dig. § 280.*]

**3. JUDGMENT (§ 137*)—DEFAULT—VACATION—STATUTES.**

The original inherent power of the court to relieve a party from a default judgment is limited by Code W. Va. 1906, c. 125, § 47, providing that if a defendant against whom a judgment is entered in the office, whether an order for an inquiry of damage has been made or not, shall, before the end of the term at which it becomes final, appear and plead to issue, the judgment shall be set aside, but, if the judgment has been entered up in the court or the order for inquiry of damages has been executed, it shall not be set aside except for cause.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 262–264; Dec. Dig. § 137.*]

**4. JUDGMENT (§ 162*)—DEFAULT—NEGLIGENCE.**

Plaintiff sued out process early in January, 1909, in a suit to recover for injuries to his wife alleged to have been caused by defendant's negligence, and had it duly served. At that time no compromise was pending, and defendant, having casualty insurance, and having agreed only to settle through the insurance company, committed the defense of the suit to the insurance company's agent without ever employing any attorneys of its own, or taking any steps to protect its interests. The casualty company wrote to its attorneys, but, though it was notified by them that no appearance had been entered, did nothing toward settlement of the case or to prepare for trial, but wrote counsel that it had not lost hope of settling the case without a trial, and that counsel would be advised from time to time. It did nothing to effect a settlement. and did not so advise counsel until after a default judgment had been rendered, and an inquiry of damages had at the June, 1909, term. *Held*, that the negligence of the casualty company's agent was the negligence of defendant, and that the latter was not for that reason entitled to a vacation of the default.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 319–322; Dec. Dig. § 162.*]

**5. JUDGMENT (§ 162*)—DEFAULT—VACATION—MERITS.**

Plaintiff recovered a judgment by default for injuries to his wife by the coming off of a wheel of defendant's coach in which she was riding as a passenger in Yellowstone Park. In support of an application for vacation of the default, defendant filed affidavits that the coach was new, having been in service only a little over a month at the time of the accident; that each of the horses was an experienced, reliable stage horse, and that neither the driver nor any horse in the team had been in an accident before; that on the morning of the accident the spindles of the coach were oiled, the wheels replaced, and the nuts tightened as securely as could be done with a wrench. In reply, however, an affidavit was filed that 10 days prior to the accident the nut came off one of the spindles of the coach while it was being used in the Park; that

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

· it was found by the president of the company who. was driving in the rear of the coach in a buggy; and that he overtook the coach and replaced the ·nut on the spindle, which affidavit was not contradicted. *Held*, that defendant's showing of merits was insufficient to justify a vacation of the judgment.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 319–322; Dec. Dig. § 162.*]

6. JUDGMENT (§ 138*)—DEFAULT—VACATION—GROUNDS—EXCESSIVE DAMAGES.
Where damages were awarded on an inquiry after judgment by default, the judgment would not be set aside because the damages were excessive, unless the amount awarded was so grossly excessive as to indicate a bad motive.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 249–251, 254; Dec. Dig. § 138.*]

7. DAMAGES (§ 132*)—PERSONAL INJURIES—AMOUNT AWARDED.
Plaintiff, a young matron of good social position and accomplishments, was injured by the collapse of a coach in which she was riding as a passenger in a park. She sustained a fracture of the right humerus near the shoulder and again near the elbow joint; the latter fracture involving the joint and producing anchylosis thereof. She also sustained severe contusions of the chest, left hip, and sprains in the dorsal and lumbar regions; abrasions on the chin and right cheek, producing an extreme surgical shock, causing neuritis to the nerves of the right arm, right shoulder, and right lower extremity, and a severe injury to the nerves supplying the right shoulder, arm, and lower extremity. She was unable to flex her right arm at the elbow or to raise that arm, which condition was permanent. She also suffered great pain. *Held*, that a verdict allowing plaintiff $15,000 for such injuries was not so excessive as to indicate bad motive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 178, 372–385, 396; Dec. Dig. § 132.*]

In Error to the Circuit Court of the United States for the Southern District of West Virginia, at Charleston.

Action by Gail V. Lynch against the Wylie Permanent Camping Company. From an order denying defendant's motion to open a judgment by a default after execution of a writ of inquiry of damages, it brings error. Affirmed.

The following is the opinion of Keller, District Judge, in the Circuit Court, omitting here the statement of facts, which appears in full in the opinion of Circuit Judge Pritchard:

It could serve no useful purpose here to go severally and extensively into the voluminous affidavits filed, and could only serve to lengthen a statement which is already necessarily long. They divide themselves broadly into three classes, namely: Those intended to show matter of mistake, misunderstanding, or excusable neglect; those intended to show (or rebut) the existence of a meritorious defense; and those intended to show (or rebut) the award of excessive damages by the jury.

And first, before referring to any of these affidavits (or the substance of the facts disclosed in them), it may be well to quote the statute of West Virginia, applicable to a case like the present. This is section 47 of chapter 125 of the Code of West Virginia, which provides that: "If a defendant against whom a judgment is entered in the office, whether an order for an inquiry of damages has been made or not, shall, before the end of the term at which it becomes final, appear and plead to issue, * * * the judgment shall be set aside, but if the judgment has been entered up in court or the order for an

inquiry of damages has been executed, it shall not be set aside without good cause be shown therefor."

Coming now to the gist of the affidavits, those of the first class enumerated show that the defendant carried with the Maryland Casualty Company a policy of insurance, by which, in consideration of the payment of a premium, the latter company bound itself (to the extent of $5,000 for each person injured) to save the defendant harmless in the event of an accident, but the defendant was precluded by the terms of this policy from making any settlement of a claim for damages, except at its own cost, and was not in any way allowed to control the defense of any suit brought against it.

When the accident to plaintiff occurred, Mr. A. W. Miles, president of defendant company, promptly reported the same to the casualty company, together with the information that the plaintiff's husband (who at the time was not aware of the permanent nature of plaintiff's injuries) would compromise the claims of himself and the plaintiff, and release the defendant from liability, for the sum of $2,300, and the affidavit of Mr. Lynch confirms this statement, which was made in a conversation wherein Mr. Miles introduced the subject, and Mr. Lynch agreed to hold this offer open until September 1, 1908. Not hearing from defendant, Mr. Lynch, on September 26, 1908, wrote Mr. Miles, calling attention to the fact that he had heard nothing from him relative to settlement, and notifying him that, if he did not hear promptly, he (Mr. Lynch) would institute suit in both cases. To this letter he received no reply. On November 11, 1908, H. D. Anthony, an agent of the casualty company, called on Mr. Lynch, and stated that he represented the Wylie Permanent Camping Company, and wanted to know the best terms on which the two claims against the defendant could be settled. At this time Mr. Lynch had not yet learned of the permanent nature of the injury to the elbow joint of plaintiff, but did learn of it from Dr. Clark some 17 days later. Mr. Lynch, therefore, told Mr. Anthony that he would accept the sum of $2,000 in settlement of the claims of Mrs. Lynch and himself if paid within two weeks from that time, and agreed that plaintiff would submit to a medical examination, and within a week thereafter plaintiff was examined at the instance of said Anthony by Dr. Andrew Heinlein. A day or two after this examination Mr. Lynch was called up on the telephone by some one who said his name was Anthony, and that he would be down to see Mr. Lynch within a day or two. Mr. Lynch's affidavit further states that said Anthony did not come, and that he had no other communication with Anthony, the defendant, or the casualty company (which latter party he never knew in the matter): that on November 28, 1908, Mr. Lynch learned from Dr. Clark of the permanent nature of plaintiff's injuries, and after waiting to hear from Mr. Anthony until January, 1909, he instituted this suit. Mr. Lynch's affidavit is very specific, is not denied by any counter affidavit, and shows conclusively that all negotiations looking toward a settlement had ended two weeks after November 11, 1908, and were never renewed in any way, after suit brought in January, 1909.

When the process in this suit was served, it was sent to Mr. Miles at Gardiner, Mont., who promptly sent the same to Mr. Charles W. Maydwell, manager of the claims division for the casualty company, at Baltimore, Md., who thereupon wrote to Messrs. Price, Smith, Spilman & Clay, their regular attorneys at Charleston, W. Va., notifying them of the institution of the two suits in the United States Circuit Court at Charleston, and saying: "In order to prevent any default in the matter, we would ask you to enter an appearance on behalf of the defendant, and we will, as soon as we can have copies made, forward you full information regarding the accident." To this, Mr. Clay, for the firm, responded by a letter in which he said: "The declaration will not be filed before February rules, which is the first Monday in February. The attorneys for the plaintiff are Handlan and Reyman, of Wheeling, West Virginia. The practice in the United States court is the same practice as that of the state, and it is unnecessary to enter an appearance at rules to prevent judgment by default. We have not, therefore, entered our appearance, but will look after the case for you and keep you advised as to its progress." This letter of Mr. Clay was dated on January 27, 1909, and on the day before (January 26, 1909) Mr. Maydwell wrote Messrs.

Price, Smith, Spilman & Clay as follows; this letter probably crossing that of January 27th: "We beg to inclose herewith copies of correspondence, etc., which will explain the above action. We are not without hope of being able to settle these cases without the necessity for trial, *and will advise you from time to time.*" The receipt of this letter was acknowledged by the attorneys on January 28, 1909.

The affidavits show that no communication was had between, plaintiff or her attorneys and defendant the casualty company or its attorneys, from November, 1908, until after the execution of the writ of inquiry, and there is nothing in the affidavits to show that the casualty company again communicated with its attorneys, or received any communication from them. The letters above quoted from are relied on by the proponent of the motion to establish a misunderstanding between the casualty company and its attorneys. The affidavits of Clifford Perry and A. W. Miles set forth that the coach No. 34 of the Wylie Permanent Camping Company was a new Concord coach which had been put into service about July 1, 1908; that each of the horses in the team was an experienced, reliable stage horse, having been so used for at least five years; and that neither the driver nor any horse in the team had been concerned in any accident theretofore. Mr. Perry's affidavit further avers that on the morning of the accident he oiled the spindles of the coach, put the wheels back on, and with a wrench tightened the nuts on the end of each spindle, as securely as could be done with a wrench. These affidavits were doubtless filed to establish the existence of a meritorious defense by overcoming the presumption of negligence on the part of defendant arising from the application of the doctrine of res ipsa loquitur to the facts of the accident.

However, the affidavits of Messrs. Charles J. Lynch, I. D. McKeever, and the plaintiff show that on or about August 17, 1908, in a conversation with Mr. Miles, Mr. Lynch stated that he had heard that about 10 days before the accident a nut or tap had come off one of the spindles of this coach, No. 34, while it was being driven in the park, and that Mr. Miles, driving in a buggy in rear of the coach found the nut, and overtook the coach and stopped it, replacing the nut on the spindle, and asked Mr. Miles if it was true, and Mr. Miles admitted that it was. Mr. Lynch then asked Mr. Miles if the nut came off the spindle engaging the left front wheel, and Mr. Miles, after hesitating, replied, "I won't say." The affidavits of Messrs. Charles J. Lynch and I. D. McKeever further relate that shortly after the accident they went to the barns of the defendant at Gardiner, Mont., and there saw Clifford Perry, the driver of coach No. 34, on the day of the accident, who showed them said coach No. 34, and that, upon examining said coach, they found that the left front spindle of said coach, with part of the axle, had been cut off, and a new spindle and piece of axle welded on. Mr. Lynch asked Perry where said left front spindle was, and was told that, when the same was cut off, Mr. Miles had taken possession of it; that in talking with Mr. Miles on the same day Mr. Lynch said he would like to see the spindle that had been cut off, but Mr. Miles did not show it to him. These affidavits were filed in time to have allowed of the filing of counter affidavits denying the matters alleged therein if they were untrue, but no such affidavits have been filed, and I think that the matters set up are sufficient to fully meet the affidavits of Messrs. Perry and Miles upon the question of a meritorious defense.

On the question of the amount of damages awarded by the jury, affidavits were filed by physicians, Wallace De Witt and Andrew Heinlein, as to the effect in retarding recovery of the paralysis from which Mrs. Lynch had suffered some time prior to the accident. Dr. Heinlein confined his affidavit to the medical opinion that this prior condition was an important factor in prolonging her disability and had a material tendency to retard her recovery from the effects of the accidental bodily injuries received, but he also found the condition of anchylosis in the elbow, and said in a report of Mr. Anthony, dated November 21, 1908, and embodied in his affidavit: "I desire to say that I think the hemiplegia would have something to do with the patient in not recovering so well as she would if the paralysis was not present. Yet, you can have anchylosis following an injured elbow in

a healthy subject. She no doubt has anchylosis, and the elbow might be benefited by an operation. There will be more or less stiffness all the time, and may improve some in time."

The affidavits of Dr. McCartney (who took the X-ray photographs) and Dr. Clark, both of whom were witnesses before the jury, are positive as to the permanent nature of the injuries to the bones of the arm, and that they resulted wholly from the accident, and that the prior attack of paralysis had nothing to do with them. Dr. McCartney further testified, and repeats in his affidavit, that the fracture of the right humerus near the shoulder which he saw by means of the X-ray machine has involved the nerves of that region, and that plaintiff is unable to raise her right arm and never will be able to raise it.

These physicians further depose that, owing to the nervous condition of the plaintiff consequent upon her injuries, it would be very injurious to her to have to go through another trial. The affidavits filed are very voluminous, and it is impracticable within any reasonable limits to present their entire substance, but I think that what has been said will perhaps present a skeleton of the matters involved. The question of opening this judgment addresses itself to the sound discretion of the court, but in this state this discretion is not as broad as it would be but for the statute.

[3] The authority to relieve a party in default is inherent in courts of general jurisdiction, but, where a statute defines the cases in which the application may be brought, such statute is a statute of limitation, since the original power to relieve is inherent. 6 Ency. Plead. & Prac. 149, 153; Gerish v. Johnson, 5 Minn. 23 (Gil. 10). The statute of West Virginia above quoted requires the showing of good cause in a case like the present, where the writ of inquiry has been executed, to empower the court to open the judgment. This, in my judgment, is clearly a limitation upon the otherwise inherent power of the court to open the judgment, and requires the existence of some good ground for disturbing the status quo.

[4] Does such ground exist in this case? Considering the matter for the moment independently of the question whether a meritorious defense exists, and taking that as admitted, what are undisputed facts? The plaintiff sued out process early in January, 1909, and had it duly served. At that time no compromise was pending, and the defendant had tied its hands by its agreement with the Casualty Company, and had committed its affairs to that company as its agent, and, under the evidence, never employed any attorney of its own, or took any steps to protect its interest, relying on the fact that it had had an offer of compromise within the limits of the liability against which its policy afforded protection and had communicated that offer to the casualty company; and the attorneys who were written to were not the attorneys of the defendant, but of the insurance or casualty company, though, by the contract of insurance, doubtless entitled to appear for defendant.

The insurance company, though notified by its attorneys that no appearance had been entered, and having no reason to suppose that, in the absence of some proposition for settlement, the plaintiff would sleep on her rights, did absolutely nothing either toward the settlement of the case or toward preparation to meet it in court. It had written its counsel that it had not lost hope of settling the case without a trial, and that it would advise counsel from time to time. It neither did anything looking toward such settlement nor did it advise its counsel of the fact that it had done nothing and was doing nothing.

Under the circumstances I cannot imagine a case of greater neglect than that shown by the casualty company in its conduct of this affair. The plaintiff, through her husband and agent, had, at the request of defendant, made a proposition for settlement based on what was then believed to be the state of the injuries to plaintiff, which proposition was communicated to the insurance company, and was allowed to expire absolutely without any action or inquiry by that company. In September, 1908, after its expiration, plaintiff, still by her husband and agent, courteously wrote defendant that the time fixed in the proposition for settlement had expired, and begged a reply, stating that unless he soon heard suit would be instituted. No reply

was made by defendant, but apparently this letter was forwarded to the insurance company, as on November 11, 1908, Mr. H. D. Anthony, an agent of the casualty company, claiming to represent the defendant, came to see Mr. Lynch, and asked for terms of settlement, evidently recognizing that the proposition formerly made had expired. Mr. Lynch stated terms based on his lack of knowledge of the permanent nature of plaintiff's injuries, and gave a time limit of two weeks for their acceptance or rejection, courteously permitting a medical examination of plaintiff by a physician of Mr. Anthony's selection. This examination was made and reported to Mr. Anthony, and time ran on to the 1st of January, 1909, and not a word was heard from the insurance company as to whether or not the proposition was accepted. Suit was brought and process served. Only two trial terms of the court are held each year, the next term being in June, 1909. That term arrived and not one thing was done looking either to settlement or to defense.

I can scarcely conceive of a case of more utter neglect of duties that imposed action of one kind or the other. It is not my place to apportion responsibility for the situation which resulted, but surely the terms of Mr. Maydwell's letter of January 26, 1909, may well have led the attorneys to believe that active efforts were on foot to effect a compromise, and to have caused them to rely upon the assurance that the result of those efforts would be made known to them. As a matter of fact no such efforts were on foot, and the duly authorized agent of the defendant seems to have been a devout adherent of the creed of laissez faire. The defendant, having by its contract committed its defense to the insurance company, cannot be heard to complain of the neglect of its duly constituted agent. The neglect of that agent is in law the neglect of the defendant.

It is unnecessary to refer to any large number of authorities, though they exist in vast numbers, and are, of course, to be found both supporting and denying motions to open or vacate judgments by default; but most of the cases were decided in jurisdictions where there was apparently no statute limiting the inherent power of the court to open defaults. See 1 Black on Judgments (2d Ed.) § 341, and the cases there cited. In Myers v. Landrum, 4 Wash. 762, 31 Pac. 33, it was held that a motion to vacate a judgment by default is properly overruled when the affidavits merely disclose a lack of attention to the case on the part of counsel and client. See, also, to similar effect, Insurance Co. v. Swineford, 28 Wis. 257; Moran v. Mackey and Others, 32 Minn. 266, 20 N. W. 159; Burke v. Stokely, 65 N. C. 569; Spaulding et al. v. Thompson et al., 12 Ind. 477, 74 Am. Dec. 221. In Scrivner v. Malone, 30 Tex. 774, it was held that, where there was a judgment by default, it is no ground for a new trial that the attorney spoken to by the defendant failed to put in a defense, unless it appears that the plaintiff had in some way caused this neglect of duty. In Kreite v. Kreite, 93 Ind. 583, it was held: "In an application to set aside a judgment under section 396, R. S. 1881, it must not only appear that the party has a defense, but that the judgment was taken against him through his mistake, inadvertence, surprise, or excusable negligence. Where a party simply employs an attorney, informs him of his defense, and pays no further attention to his cause, he is himself guilty of gross negligence, and is not entitled to relief from such judgment."

In West Virginia, under the statute above quoted, the decisions uphold the general trend of the decisions elsewhere to the effect that to authorize the opening of a judgment by default, not only must it appear that the party seeking to open the judgment has a meritorious cause of action or defense, as the case may be, but that he has otherwise a good cause to ask the relief, and I conceive their general effect to be that neglect on the part of the party himself will not be relieved against. See Post v. Carr, 42 W. Va. 72, 24 S. E. 583, the first point of the syllabus defining the good cause required in these words: "Such good cause can only appear by showing fraud, accident, mistake, surprise, or some other adventitious circumstances beyond the control of the party and free from neglect on his part." Approved in Mathews v. Tyree, 53 W. Va. 304, 44 S. E. 526; Wilson v. Kennedy, 63 W. Va. 11, 59 S. E. 736.

The two West Virginia cases relied on by defendant are, I think, widely distinguishable from the present one. In Bank of Princeton v. Johnston, 41 W. Va. 550, 23 S. E. 517, where the action of the lower court in refusing to open a judgment by default was reversed, the material facts are thus stated in the syllabus: "In an action of assumpsit upon a negotiable note, several parties are sued. Process is only served upon one, and the suit is allowed to abate as to the others. The plaintiff files with its declaration an affidavit, under section 46 of chapter 125 of the Code [1887], stating the amount he verily believes is due and unpaid from the defendant to him upon the demand, etc. At the next term of the court said defendant is dangerously sick, and unable to attend court. The attorney he relies on is deterred from going to the courthouse on account of the prevalence of smallpox in the town where the courthouse is situated. During the term, however, after judgment had been entered up against the defendant, an attorney appeared for him, and presented the affidavit of the defendant, in pursuance of the provisions of said section 46, and also presented the affidavit of said defendant's physician, showing his inability to attend court, on account of sickness, and also the affidavit of another party as to defendant's attorneys being deterred from attending court by smallpox, and moved the court to set aside the judgment and allow the defendant to plead. Said motion should have prevailed." In Varney v. Hutchinson Lumber & Mfg. Company, 64 W. Va. 417, 63 S. E. 203, where the lower court opened the judgment entered by default and upon writ of error, the Supreme Court of Appeals refused to reverse the action of the lower court, and held: "Where defendant has employed counsel practicing in the court, though residing in another county, and in good faith intended to make defense to the action, and appears to have had a good and sufficient defense thereto, but he and his counsel have, without negligence, been misled as to the time of holding the court by a change therein made so recently as not to have been discovered by them, and because of which the default occurred, the judgment below setting aside the default judgment and permitting defendant to make defense will not be reversed here on writ of error." The court in this case distinctly bases its holding on the ground that the recent change in the law and its lack of full publication at the time of the meeting of the court were pertinent upon the question as to whether client and counsel were negligent, and said: "We do not think the facts in this case show negligence." Nevertheless, the court closes by saying: "What our judgment would have been if the court below had denied a new trial we are not called upon to say, but from the whole case as presented we cannot say that there has been any abuse of discretion in awarding a new trial, and hence it is our duty to affirm the judgment." In the case of 41 W. Va. 550, 23 S. E. 517, the opinion is not very satisfactory, but it is apparent that the court based its action upon the theory that the severe illness of the defendant Johnston, and the turning back of the employed attorney on hearing of the existence of smallpox at the place of holding court, constituted such circumstances, in connection with the existence of a meritorious defense, as called upon the trial court to exercise its discretion in favor of opening the judgment.

[5] Thus far I have proceeded in stating my views as though it were conceded that the affidavits show the existence of a meritorious defense in this case; but, as a matter of fact, I fail to see (in the absence of a denial of the matters set forth in the affidavits of the plaintiff, Charles J. Lynch, and I. D. McKeever, concerning the prior coming off of a tap or burr, and the inferences that may be fairly drawn from a failure to file a counter affidavit on that subject) that a case of meritorious defense has been clearly made out. The facts set forth in the affidavit of Messrs. Miles and Perry tended to establish such a defense, but in view of the plaintiff's counter affidavits, which must, so far as they go, be taken to be true, their effect in that direction is quite neutralized to say the least.

[6] That the amount of damages awarded by the jury, unless so grossly excessive as to indicate a bad motive, cannot of itself be ground for the opening of a judgment by default, needs no comment.

[7] However, I am far from sure that any question can reasonably be raised as to the action of the jury in this regard. The plaintiff is a young

matron, evidently of good social position and accomplishments, and the result of this accident has been such as to render her, under the evidence, a more or less crippled invalid, subject to constant pain, and practically debarred from those social pleasures and relaxations which are common to and enjoyed by persons of her age and condition, as well as from those household cares which are not only the duties but the pride and pleasure of a normal young matron.

The conclusion of the court is that the motion to open the judgment must be denied, and I announce it the more willingly that it can be made the subject of a writ of error (Rio Grande Irrig. & Colonization Co. v. Gildersleeve, 174 U. S. 609, 19 Sup. Ct. 761, 43 L. Ed. 1105), whereas a decision such as the other was is, as I understand the federal practice, not the subject of review by such writ.

George E. Price, Buckner Clay, and Oliver M. Harvey (Wm. Wallace, Jr., and Malcolm Jackson on the briefs), for plaintiff in error.

J. B. Handlan and John H. Holt (Holt & Duncan, on the brief), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

PRITCHARD, Circuit Judge. This is an action at law instituted in the Circuit Court of the United States for the Southern District of West Virginia on the 1st day of January, 1909, to recover damages for injuries alleged to have been caused by the negligence of the defendant company.

The case was argued and submitted at the November term, 1910, of this court, and on the 11th day of October, 1911, was restored to the docket for further argument on the question as to whether the court below had jurisdiction; that question not having been raised at the time of the first argument nor had it been raised in the court below. The following is a statement of the facts incorporated in the opinion of the learned judge who heard the case below:

"The plaintiff in this action is a young married woman, a citizen and resident of the state of Ohio, and the defendant is a corporation chartered under the laws of the state of West Virginia, and doing business in the Yellowstone National Park, in the states of Wyoming, Montana, and Idaho, inter alia, as a carrier of passengers by stage coach for hire and reward.

"In August, 1908, plaintiff and her husband, who is an attorney at law, were visiting the Yellowstone National Park as tourists, and plaintiff, in consideration of the sum of $40 paid by her to the defendant, became a passenger on one of the defendant's coaches, to be carried upon a journey through the Yellowstone National Park.

"On August 7, 1909, while a passenger on the said coach, the left front wheel came off the spindle on which it turned, the front of the coach dropped down on the road, the horses ran away, the coach overturned, and the plaintiff was violently precipitated to the ground, and dragged by the overturned coach, with the result that she was seriously and permanently injured, her various injuries being thus described in the declaration: 'A fracture of the right humerus, near the shoulder; a fracture of the right humerus near the elbow joint, and which fracture extended into and involved said elbow joint, producing anchylosis of said elbow joint; a displacement of the bones forming the right elbow joint; severe contusions of the chest; severe contusions of the left hip; severe sprains in the dorsal and lumbar region; severe abrasions on the chin and right cheek, producing an extreme surgical shock, causing neuritis to the nerves of the right arm, right shoulder, and right lower extremity, severe injury to the hamstring muscles of the right lower extremity, and a severe injury to the nerves supplying the right

shoulder, right arm, and right lower extremity.' The declaration avers, and the medical evidence had at the hearing of the writ of inquiry substantiated the claim, that, on account of her said injuries, plaintiff was unable to flex her right arm at the elbow, or to raise her right arm, and that these conditions as to her right arm are permanent. X-ray photographs taken by a medical witness were introduced before the jury showing the several fractures of the right arm, and the anchylosed condition of the elbow joint; and the plaintiff testified to the pain and suffering that she had undergone, and still undergoes daily, and the jury were able to see to a certain extent, the permanent nature of the injuries from which she suffered.

"Plaintiff, in her declaration, set forth that about four years and eight months prior to said accident she had suffered a stroke of paralysis affecting her right arm and right limb, but averred (which averments were supported by medical evidence by two physicians who had treated her) that at the time of the accident she had regained a very good use of her arm and limb, and suffered no pain whatever. I mention this at this place to show that her former condition was set forth in the declaration, and was the subject of evidence before the jury.

"A summons against the defendant was sued out in the clerk's office of this court, and was issued on the 5th day of January, 1909, returnable to February rules, 1909, and on January 7, 1909, was duly served upon the State Auditor, who, under the present laws, is made the attorney in fact for all nonresident domestic corporations chartered under the laws of the state. At March rules, 1909, the declaration was filed in the clerk's office. No appearance being entered on behalf of the defendant, the usual rules were taken in the clerk's office, and an order for the execution of a writ of inquiry of damages was awarded, and the case was placed on the office judgment docket, for the June term, 1909, convening on the first Tuesday in June. This docket, together with the trial docket of law causes at issue, was caused to be printed, and copies thereof were furnished generally to counsel accustomed to practice at this bar. Early in the term the attorney for the plaintiff appeared in open court and asked that a day be set for the execution of the writ of inquiry, and the 2d day of July, 1909, was accordingly fixed, at which time the plaintiff and her witnesses, including several eye-witnesses to the accident, and two physicians (one of whom had made X-ray photographs of her arm), were introduced before the jury, and were cross-examined by the court, so far as such cross-examination suggested itself to the court by reason of the prior condition of the plaintiff. The jury awarded to the plaintiff the sum of $15,000 by way of damages, that being the amount of damages laid in the declaration, and judgment was rendered thereon by the court.

"On the same day, but after the rendition of the judgment, Mr. Buckner Clay, a member of the firm of Price, Smith, Spilman & Clay, attorneys residing in the city of Charleston, where the court was in session, appeared in court, and stated that he had just heard that this trial was in progress, and he thereupon made the statement contained in his affidavit. On the 31st day of July, 1909 (and before the close of the term), the present motion to vacate and set aside the execution of the order of inquiry of damages and the judgment entered upon the finding of the jury in default of the appearance of the defendant was duly filed, based upon the following grounds set up in said motion:

"(1) That the failure of said defendant to appear and plead to this action and to make defense herein was due to an excusable misunderstanding between said defendant, residing in the state of Montana, and its said attorneys, Price, Smith, Spilman & Clay, residing in the state of West Virginia, as to the defense of said action, and that, by reason of such misunderstanding, the said defendant and its said attorneys failed to appear or plead to said action or to make defense to the same on said second day of July, 1909, when said order of inquiry of damages was executed, and said judgment by default entered thereon.

"(2) Because the failure of said defendant to appear and plead to said action and to make defense thereto was due to mistake, surprise, and excusable neglect on the part of said defendant or its said attorneys.

"(3) Because such failure of said defendant to appear and to plead to said action and to make defense to the same was caused by adventitious circumstances beyond the power of said defendant reasonably to foresee or control.

"(4) Because the return of service upon the defendant of the summons issued in this action made by the marshal of this court is insufficient, illegal, and improper, and does not show due and legal service of process upon said defendant.

"(5) Because the sum of $15,000 awarded the said plaintiff as damages against said defendant, by the jury which executed the order of inquiry in this action, was greatly in excess of the damages, if any, which said plaintiff was entitled to recover against said defendant on account of the alleged injuries sustained by her, mentioned in the plaintiff's declaration filed herein.

"(6) Because said defendant has a meritorious and just defense to said action which it has been prevented from making by reason of the mistake, surprise, and excusable neglect of said defendant and its attorneys, and because of excusable misunderstanding between said defendant and its said attorneys, as aforesaid.

"(7) Because of other reasons which will be assigned upon the hearing of this motion.

"In support of said motion the defendant tendered the affidavits of A. W. Miles, Charles W. Maydwell, Buckner Clay, H. D. Anthony, Wallace De Witt, and Clifford Perry, and thereupon an order was made suspending the operation and effect of the said judgment pending the hearing and decision of said motion, and it was ordered that no execution be issued on said judgment until the further order of the court, and the motion was set down for hearing and was argued on November 2, 1909.

"On October 21, 1909, the plaintiff filed the counter affidavits of Dr. J. A. Clark, Dr. J. T. McCartney, I. D. McKeever, Myrtle Clements, Sallie A. Du Bois, Charles J. Lynch, Gail V. Lynch, Cora Spriggs, and J. B. Handlan, and on the day of hearing the defendant filed the supplemental affidavits of A. W. Miles, Dr. Wallace De Witt, and Buckner Clay, and the affidavits of O. M. Harvey and John Andrews Heinlein; and the plaintiff, in resistance of the motion, filed the supplemental affidavit of Charles J. Lynch."

[1] As we have already stated, the question as to the jurisdiction of the court below was not raised at the first hearing, but for convenience we will dispose of that matter before considering the assignments of error, which relate to the rulings of the lower court.

It is insisted by counsel for the plaintiff in error that:

"The record not only fails to show jurisdictional facts, but affirmatively shows that the federal court never acquired jurisdiction of the defendant, because the service of its process—which was a substituted service—was had in a manner unauthorized by law."

The defendant company being what is known under the West Virginia statute as a "nonresident domestic corporation," it is insisted that the proper service has not been had upon said company, and that for this reason the lower court was without jurisdiction. Under the laws of the state of West Virginia there is a classification of corporations into "resident domestic corporations" and "nonresident domestic corporations" for the purpose of convenience in assessing license taxes on charters, etc. Chapter 32, § 124 (section 1046), of the Code of West Virginia, 1906, which prescribes such classification, reads as follows:

"For convenience in classification for prescribing and assessing license tax on charters or certificates of incorporation, corporations are divided into two classes, domestic and foreign. A domestic corporation is (a) one incorporated by or under the laws of this state or (b) under the laws of the state of Virginia before the twentieth day of June, eighteen hundred and sixty-three, and

which has its principal place of business and chief works (if it have chief works) in this state. Every other corporation is a foreign corporation. Domestic corporations are subdivided into two classes, resident and nonresident. A resident corporation is a domestic corporation whose principal place of business and chief works (if it have chief works) are located within this state, and a nonresident corporation is a domestic corporation whose principal place of business or chief works is located without this state. The words, 'chief works' as used in this chapter, include shops, factories, mines, manufacturing plants, or any building or other place where mechanics, artisans or laborers are employed."

The classification of corporations as provided for in the foregoing section was intended to provide a means by which the state of West Virginia could, at all times, be in a position where its courts would have jurisdiction to determine any question affecting such corporations, such as the payment of license tax on charters, the institution of suits, as in this instance, etc. The term "nonresident" domestic corporation is inconsistent and contradictory, but it is used in the West Virginia statute merely as a means of designation, and does not change the legal residence of such corporation. This corporation being created by and under the laws of the state of West Virginia, it necessarily follows that its legal residence is in that state. The law on this point is well stated in the case of Germania Fire Insurance Company v. Francis, 11 Wall. 210, 20 L. Ed. 77. Mr. Justice Davis, who delivered the opinion of the court, used the following language:

"The declaration avers that the plaintiff in error (the defendant in the court below) is a corporation created by an act of the Legislature of the state of New York, located in Aberdeen, Miss., and doing business there under the laws of the state. This, in legal effect, is an averment that the defendant was a citizen of New York, because a corporation can have no legal existence outside of the sovereignty by which it was created. Ohio & Mississippi R. R. Co. v. Wheeler, 1 Black, 286, 17 L. Ed. 130; Louisville R. R. Co. v. Letson, 2 How. 497, 11 L. Ed. 353. Its place of residence is there, and can be nowhere else. Unlike a natural person, it cannot change its domicil at will, and, although it may be permitted to transact business where its charter does not operate, it cannot on that account acquire a residence there."

Also in the case of Ex parte Shaw, 145 U. S. 444, 12 Sup. Ct. 935, 36 L. Ed. 768, Mr. Justice Gray, who delivered the opinion of the court, after quoting from the opinion of Mr. Chief Justice Taney, in the case of Bank of Augusta v. Earle, 13 Pet. 519, 10 L. Ed. 274, to the effect that " * * * a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created," said:

"This statement has been often reaffirmed by this court, with some change of phrase, but always retaining the idea that the legal residence, the home, the domicil, the habitat, the residence, the citizenship of the corporation can only be in the state by which it was created, although it may do business in other states whose laws permit it."

It is undisputed that the plaintiff is a resident and citizen of the state of Ohio. Thus we have at the outset a case wherein there is a diversity of citizenship, and where it is shown that the requisite jurisdictional amount is involved, and the only question open for consideration is as to whether the defendant company has been duly served in accordance with the laws of the state of West Virginia. Chapter 124, § 8a (sec. 3805), of the Code of West Virginia 1906, reads as follows:

"The Auditor of this state shall be and he is hereby constituted the attorney in fact for and on behalf of * * * every nonresident domestic corporation. * * * Every such * * * nonresident corporation shall, by power of attorney duly executed, acknowledged and filed in the Auditor's office of this state, appoint said Auditor and his successors in office attorney in fact to accept service of process and notice in this state for such corporation."

The marshal's return of service is in the following language:

"Received this writ at Charleston, West Virginia, on the 7th day of January, 1909, and served the same on the within named Wylie Permanent Camping Company, a corporation, by delivering an office copy thereof to A. C. Scherr, Auditor of the state of West Virginia, at Charleston, West Virginia, on this the 7th day of January, 1909. The said A. C. Scherr being the person appointed pursuant to law for the service of legal process on the said corporation in the state of West Virginia. The said A. C. Scherr being a resident of the said county of Kanawha and within said county at the time of the service as aforesaid."

The amended return of the marshal is in the following language:

"Received this writ at the city of Charleston, county of Kanawha, and state of West Virginia, on the 7th day of January, A. D. 1909, and executed the same as to the within named defendant, Wylie Permanent Camping Company, a corporation, by then and there, upon the 7th day of January, A. D. 1909, in the said city of Charleston, in the county of Kanawha, and state of West Virginia, delivering an office copy thereof to A. C. Scherr, Auditor of the state of West Virginia.

"That said A. C. Scherr, Auditor of the state of West Virginia, then and there at the time of such service, being the person and officer designated and appointed by the laws of the state of West Virginia upon whom legal, process against said corporation could be served within the state of West Virginia, and he, the said A. C. Scherr, Auditor of the state of West Virginia, at the time of such service and delivery as aforesaid, then and there being a resident of said city of Charleston, county of Kanawha and state of West Virginia, and did then and there have his said office of Auditor located within and was then and there discharging his duties as such Auditor in the said city, county and state aforesaid, and at the time of said service and delivery as aforesaid neither the president, vice president, treasurer, secretary, general manager, nor any director, nor any other officer or agent of said corporation, nor any other person resided in said state, nor was found therein upon whom such legal process could be served with respect to said corporation."

However, it is insisted that, inasmuch as it does not affirmatively appear from the marshal's return that the Auditor had been appointed the attorney in fact for the defendant company, that the service was incomplete and, therefore, fatally defective. If this contention be true, then it would be an easy matter for a corporation, refusing to comply with the requirements of the law, to enjoy the rights and privileges granted in its charter and at the same time be immune from suits of any character whatsoever.

The statute in question provides:

"* * * The Auditor shall be and he is hereby constituted the attorney in fact for and on behalf of * * * every nonresident domestic corporation."

Thus it will be seen that the Auditor, upon whom service was had in this case, was by law constituted the attorney in fact for and on behalf of the defendant company.

The West Virginia statute to which we have referred as classifying corporations was passed upon by the Supreme Court of the United States in the case of St. Mary's Petroleum Company v. West Virginia, 203 U. S. 183, 27 Sup. Ct. 132, 51 L. Ed. 144. The question of the constitutionality of the statute was before the court in this case. Mr. Chief Justice Fuller, in speaking for the court, among other things, said:

"The state had the clear right to regulate its own creations, and, a fortiori, foreign corporations permitted to transact business within its borders. In this instance it put all nonresident domestic corporations, which elected to have their places of business and works outside of the state, and all foreign corporations coming into the state, on the same footing in respect of the service of process, and the law operated on all these alike. Such a classification was reasonable, and not open to constitutional objection. Orient Insurance Co. v. Daggs, 172 U. S. 557, 563 [19 Sup. Ct. 281, 43 L. Ed. 552]; Waters-Pierce Oil Company v. Texas, 177 U. S. 43 [20 Sup. Ct. 518, 44 L. Ed. 657]; Central Loan & Trust Company v. Campbell, 173 U. S. 84 [19 Sup. Ct. 346, 43 L. Ed. 623]; National Council v. State Council (decided November 19, 1906) [203 U. S. 151, 27 Sup. Ct. 46, 51 L. Ed. 132]; Northwestern Life Insurance Co. v. Riggs [203 U. S. 243, 27 Sup. Ct. 126, 51 L. Ed. 168, 7 Ann. Cas. 1104]; Brannon on Fourteenth Amendment, c. 16. It is true that the prior law left it to the corporation to appoint an attorney to represent it, and that the act of February, 1905, changed this so as to make the Auditor such attorney, but this at the most was no more than an amendment as to the appointment of an agent, and, when the St. Mary's Company accepted its charter, it did so subject to the right of amendment. * * *"

It will be observed that the Supreme Court called attention to the fact that the status of corporations of this character was changed by virtue of the enactment of the statute of West Virginia, which provides for the classification of resident and "nonresident domestic corporations," and, in referring to that point the court, said:

"It is true that the prior law left it to the corporation to appoint an attorney to represent it, and that the act of February, 1905 [Acts 1905, c. 39], changed this so as to make the Auditor such attorney, but this at the most was not more than an amendment as to the appointment of an agent, and, when the St. Mary's Company accepted its charter, it did so subject to the right of amendment. * * *"

While the question before us was not considered by the Supreme Court in that case, nevertheless, there is a clear and well-defined expression by the court to the effect that the Auditor by virtue of this statute was constituted and designated as the attorney of the company for the purposes hereinbefore mentioned.

We have carefully considered the amended return of the marshal, and it clearly shows that A. C. Scherr was the Auditor of the state of West Virginia at the time of this service, that he was served with process in this case, and that he had been designated and appointed by the laws of the state as the person upon whom legal service against such a corporation could be served within said state. The return appears to be full and complete, and certainly was as full as the marshal could have made it under the circumstances. The defendant company accepted the charter which was granted to it by the state, and the provisions of this act became as much a part of the same as if they had been written into or incorporated as a part of the charter. The com-

pany having operated under its charter, in pursuance of the laws of that state, it cannot now be heard to say, in a case like the one at bar, that it did not comply with the law by appointing the Auditor its attorney in fact. We are therefore of the opinion that this contention is without merit.

It is also insisted that the allegations of the declaration contradict the return of the marshal. We do not think so. The return of the marshal shows that the service was had upon the Auditor of the state, and that he was the person appointed by law upon whom such service should be made. It is shown by the declaration that the defendant company was a citizen and resident of the state of West Virginia, duly incorporated under the laws of that state, and that it was engaged in carrying on the business of "a common carrier of passengers for hire and reward, by means of coaches, wagons, carriages and horses, through the National Yellowstone Park, in the states of Wyoming, Montana, and Idaho." These statements, when considered with the return of the marshal, furnish a complete description of a "nonresident domestic corporation" as contemplated by the West Virginia statute. Therefore there is nothing in the declaration that in the slightest conflicts with the return of the marshal.

However, it is further insisted that it does not affirmatively appear that the defendant corporation's office or chief place of business, etc., was without the state of West Virginia. As respects this question, it is shown by the amended return of the marshal that:

"* * * At the time of said service and delivery as aforesaid neither the president, vice president, treasurer, secretary, general manager, nor any director, nor any other officer or agent of said corporation, nor any other person resided in said state, nor was found therein upon whom such legal process could be served with respect to such corporation."

We do not deem it necessary to a determination of this point to pass upon the legal effect of this portion of the marshal's amended return in view of other facts which appear in the record.

[2] However, we are not confined to the return of the marshal and the declaration as to the question of jurisdiction. It has been repeatedly held that the court may look to the entire record for the purpose of determining this question. Even if the return of the marshal and the allegations of the declaration are not sufficient to show that the defendant company belongs to the class known as nonresident domestic corporations, the record contains the affidavit of A. W. Miles, president of the defendant company, in which, among other things, it is stated, in effect, that the defendant is a "nonresident domestic corporation" of the state of West Virginia under the classification of the statute of that state. Paragraph 2 of the affidavit in question reads as follows:

"The summons and complaint in the above-entitled action, or pretended summons and complaint, were received by me through the United States mail on or about the 8th day of January, 1909, at my residence in Livingston, Park county, Montana; that the said above-named defendant corporation did not at said time nor prior thereto, and has not at this time, nor at any time whatsoever, maintained any office or owned any property whatsoever in the state of West Virginia."

This statement clearly shows that at the time this suit was instituted the defendant company did not, nor at any time prior thereto, maintain any office or own any property in the state of West Virginia; and it is shown by the declaration that this corporation at the time of the bringing of this action was engaged in carrying on its business as a common carrier of passengers, etc., in the states of Montana, Wyoming, and Idaho.

In section 163; Loveland's Appellate Jurisdiction of Federal Courts, it is stated:

"If the plaintiff rests his case solely on the ground of diversity of citizenship, and fails to properly aver facts to bring the case within the jurisdiction of the circuit court, the jurisdiction of the Circuit Court of Appeals over it may be maintained if the jurisdictional facts exist and appear anywhere in the record.

"For the purpose of maintaining its jurisdiction on this ground, the Circuit Court of Appeals may look for a statement of the requisite citizenship of the parties to any part of the record of the Circuit Court, including the pleadings, the summons, or the evidence, or an amendment to the pleadings, allowed after judgment and while the Circuit Court had control of the record, or any other paper properly within the record. A remittitur of a part of the verdict cannot be used to cure a defect of jurisdiction. The recital of citizenship forms no part of a remittitur.

"The appellate jurisdiction, therefore, of the Circuit Court of Appeals, does not fail because of the insufficiency of the allegations of citizenship if it appears from the record of the Circuit Court that the case is in truth a suit or controversy between an alien and a citizen of the United States, or between citizens of different states: In such cases the Circuit Court of Appeals will proceed to dispose of the case on its merits to the same extent as if the jurisdiction had been properly set forth in the first pleading in the case."

Also, in the case of Sun Printing & Publishing Ass'n v. Edwards, 194 U. S. 377, 24 Sup. Ct. 696, 48 L. Ed. 1027, the court, in discussing this phase of the question, said:

"Had the transcript shown nothing more as to the status of Edwards than the averment of the complaint that he was a 'resident of the state of Delaware,' as such an averment would not necessarily have imported that Edwards was a citizen of Delaware, a negative answer would have been impelled by prior decisions. Mexican Central Ry. Co. v. Duthie, 189 U. S. 76 [23 Sup. Ct. 610, 47 L. Ed. 715]; Horne v. George H. Hammond Co., 155 U. S. 393 [15 Sup. Ct. 167, 39 L. Ed. 197]; Denny v. Pironi, 141 U. S. 121 [11 Sup. Ct. 966, 35 L. Ed. 657]; Robertson v. Cease, 97 U. S. 646 [24 L. Ed. 1057]. The whole record, however, may be looked to, for the purpose of curing a defective averment of citizenship, where jurisdiction in a federal court is asserted to depend upon diversity of citizenship, and if the requisite citizenship is anywhere expressly averred in the record, or facts are therein stated which in legal intendment constitute such allegation, that is sufficient. Horne v. Hammond Co., supra, and cases cited."

For the reasons stated we are of the opinion that the court below had jurisdiction to hear and determine the questions involved in this controversy.

It is also insisted by counsel for the defendant that the court below erred in entering judgment in default of the appearance of the defendant; the cause not having been regularly matured; also, that the court erred in overruling the defendant's motion to vacate and set aside the execution of the order of inquiry of damages made by the jury im-

paneled in this cause on the 2d day of July, 1909, and the judgment entered upon the finding of said jury in default of the appearance of said defendant on said date, and to allow the defendant to plead to issue and make defense upon the merits to this action. It is further contended that the court erred in refusing to open or to vacate the default judgment herein for the purpose of giving the defendant, an opportunity to make defense before the jury.

We have read and carefully considered the able and exhaustive opinion of the learned judge who tried this case in the court below, and, in view of the facts and circumstances surrounding this case, we are of opinion that his refusal to vacate the judgment was eminently proper. The opinion of the lower court meets with our hearty approval, and we hereby adopt the same as the opinion of this court on this phase of the case.

For the reasons herein stated the judgment of the lower court is affirmed.